UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRIA DEASFERNANDEZ,

　　　Plaintiff,

　　　v.

BEAUMONT HEALTH SYSTEM, *et al.*,

　　　Defendants.

_____/

Case No. 15-cv-10391

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
ELIZABETH A. STAFFORD

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [21]**

**I. INTRODUCTION**

　　　Terria Deasfernandez ("Plaintiff") commenced this action on January 28, 2015 against Ellaine Richardson and William Beaumont Hospital ("Defendants"). *See* Dkt. No. 1. The complaint alleges race discrimination and hostile work environment under Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2102; race discrimination and hostile work environment under Title VII, 42 U.S.C. § 2000e–2; unlawful retaliation; and constructive discharge.

　　　On October 12, 2015, Defendants filed a Motion for Summary Judgment. *See* Dkt. No. 21. A hearing was held on December 15, 2015 at 11:00 a.m. The matter is fully briefed. For the reasons discussed herein, the Court will **GRANT** Defendants' Motion **IN PART** and **DENY** Defendants' Motion **IN PART**.

**II. BACKGROUND**

　　　Plaintiff is an African-American woman, formally employed by Defendant William Beaumont Hospital. She began working in Beaumont in May of 1996. Dkt. No. 32 at 8 (Pg. ID No. 529). While employed there, Plaintiff was a full-time Clinical Nurse II in the Department of

Geriatric Medicine. Dkt. No. 21 at 7 (Pg. ID No. 83). Plaintiff reported directly to the Practice Manager, Defendant Ellaine Richardson, an Asian woman. *Id.* at 9 (Pg. ID No. 85).

Plaintiff alleges that the hospital had a policy of adhering to the patients' racial preferences in nurses and other health care staff. Dkt. No. 32 at 9 (Pg. ID No. 530). Allegedly, patients would tell the hospital that they did not want to be worked on by black health care staff. *Id.* The hospital would then mark "no black worker" or "NBW" on the intake form. *Id.* The forms were kept in an administrative office. However, that policy was changed at some point. *Id.* (Exhibit 3).

Additionally, toward the latter years of Plaintiff's tenure with Beaumont, there were several racial incidents. On or about March 2011, during a hand washing exercise, when Plaintiff's hands showed no signs of dirt, Defendant Richardson indicated that it was because Plaintiff was black, and therefore the dirt was not visible. Dkt. No. 32 at 10 (Pg. ID No. 531). Plaintiff complained to one of the physicians in the office. *Id.* On or about April 2011, Defendant Richardson asked Plaintiff to explain the difference between "nigger" and "nigga." *Id.* at 11 (Pg. ID No. 532). Plaintiff reported this incident to the Diversity Envoy, Beth Scott. *Id.* Ms. Scott reported the incident to her Director, Christine Nielson, and to HR Representative Lauren Hill. *Id.* On or about May 2011, Defendant Richardson showed Plaintiff an internet photo of cotton crops planted in the shape of a swastika. *Id.* at 11 (Pg. ID No. 532). At some point in the summer of 2011, the Geriatrics Department was required to go through diversity training. *Id.* (Exhibit 3).

In January of 2012, Defendant Richardson indicated to Plaintiff and others that she remained in her car while visiting a restaurant in Ferndale because she saw two black males and she was frightened. *Id.* (Exhibit 3). On or about May of 2012, Defendant Richardson came to work with a weave in her hair. She allegedly commented to Plaintiff: "I just wanted you all to

see how crazy you look coming in when you keep changing your hair every week; I wanted you all to see how stupid you people look in weaves, one day long hair, one day short, and different colors." *Id.* at 16 (Pg. ID No. 537). Defendant Richardson disputes this allegation. Dkt. No. 21 at 13 (Pg. ID No. 89).

In September of 2013, Plaintiff's co-worker apparently referred to African-American children as "nigglets." Dkt. No. 32 at 16 (Pg. ID No. 537). Plaintiff alleges that the co-worker stated that her and her fiancé were trying to find houses but they could not find one because they refused to move into a house near any "nigglets." Plaintiff reported this incident, as well as other incidents to the Human Resources Department. The co-worker was written up. Dkt. No. 21 at 10 (Pg. ID No. 86).

Approximately one week after reporting the incident involving her co-worker, Plaintiff received two written reprimands from Defendant Richardson. Dkt. No. 32 at 17 (Pg. ID No. 538). It was her first time being disciplined in her entire 19 year career. *Id.*

On or about October 11, 2013, an HR employee and a physician informed Plaintiff that other employees felt uncomfortable working with her. *Id.* at 18 (Pg. ID No. 539). Further, Plaintiff received a third reprimand. *Id.* Defendant contends the reprimands were in response to Plaintiff's refusal to speak to patients on several occasions. Dkt. No. 21 at 9 (Pg. ID No. 85).

Plaintiff filed an EEOC complaint on October 14, 2013. Dkt. No. 32 at 19 (Pg. ID No. 540). The next day, Plaintiff was placed on a medical leave of absence by her doctor. *Id.* Plaintiff resigned her position at Beaumont and took another position at a different hospital.

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. DISCUSSION

### A. Race Discrimination – Disparate Treatment

The Complaint broadly alleges "race discrimination and harassment" as a Count. *See* Dkt. No. 1 at 5 (Pg. ID No. 5). The complaint states that "Defendants discriminated against Plaintiff, and harassed Plaintiff by subjecting her to humiliation and discrimination to which other workers were not subjected, all because of her race." *Id.* at 6 (Pg. ID No. 6). This would allude to a disparate treatment theory of liability. This is confirmed by the Plaintiff's response brief, which argues "[t]he evidence in the case at bar establishes that Plaintiff was the victim of disparate treatment." Dkt. No. 32 at 16 (Pg. ID No. 543).

When it comes to a Disparate Treatment claim, "[t]he key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 703 (6th Cir. 2007). Generally, discrimination claims under the ELCRA are evaluated in the same manner as Title VII claims, and consequently they will be treated as such for the purposes

of this discussion. *Hall v. State Farm Ins. Co.*, 18 F. Supp. 2d 751, 766 (E.D. Mich. 1998) *aff'd*, 1 F. App'x 438 (6th Cir. 2001).

Defendants argue mainly that Plaintiff has not suffered an adverse employment action. An adverse employment action must be "materially adverse" for the Plaintiff to succeed on a Title VII claim. *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002). The Sixth Circuit has noted the requirements for establishing a materially adverse employment action:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999).

Plaintiff's brief does not really make any arguments with regard to this issue at all. Instead, Plaintiff states conclusively, "[c]learly, Plaintiff establishes a prima facie case of discrimination based upon this analysis as delineated by the above facts." Dkt. No. 32 at 23 (Pg. ID No. 544). However, there does not appear to be anything in the facts alleged by Plaintiff that would qualify as an adverse employment action. Plaintiff does allege that "one week after reporting the incident involving [a coworker], Plaintiff received two unwarranted written reprimands from Defendant Richardson." Dkt. No. 32 at 17 (Pg. ID No. 538). However, it appears this fact is being used to support the retaliation claim, and not the race discrimination claim. Regardless, there is no evidence to suggest a write-up is a "material adverse change" akin to "a demotion" or "a material loss of benefits." Accordingly, the Plaintiff's Disparate Treatment claim fails.

## B.  Hostile Work Environment

To prove a claim of hostile work environment, a plaintiff must prove: (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment was based on race; (4) the harassment affected a term, condition, or privilege of employment and (5) defendant knew or should have known about the harassment and failed to take action. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999). Harassment affects a "term, condition or privilege of employment" if it is sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and creates an abusive working environment. *See generally Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *accord Scott v. Central School Supply, Co.*, 121 F.3d 709 (6th Cir.1997) (unpublished). In sum, the plaintiff's evidence must be sufficient to show that the alleged conduct constituted an unreasonably abusive or offensive work-related environment or adversely affected the employee's ability to do his or her job. *Erebia v. Chrysler Plastic Prods. Corp.*, 772 F.2d 1250, 1256 (6th Cir. 1985). The elements are identical under the ELCRA. *See Chambers v. Trettco, Inc.*, 463 Mich. 297, 311 (2000). The first three elements are not in dispute.

Defendants argue that the incidents were sporadic and not continuous or severe enough to constitute a hostile work environment. Dkt. No. 21 at 24 (Pg. ID No. 100). Here, over the course of three months in 2011, Plaintiff experienced several racial incidents with Defendant Richardson. However, these incidents—being asked to explain the difference between "nigger" and "nigga," and being shown a "facebook swastika"—while "certainly insensitive," appear to "more closely resemble a 'mere offensive utterance' than conduct that is 'physically threatening or humiliating.' " *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 513 (6th Cir. 2011) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Plaintiff also argues that Beaumont hospital's policy of allowing patients to disclose racial preferences for nurses created a hostile work environment under *Chaney v. Plainfield Healthcare Center*, 612 F.3d 908 (7th Cir. 2010). However, *Chaney* is distinguishable.

First, in *Chaney*, the plaintiff worked at Plainfield Healthcare Center for only three months before being fired. In the course of that three months, coworkers on several occasions directly racially slurred her. *Chaney*, 612 F.3d at 912 ("Here, over the course of three months, coworkers called Chaney a 'black bitch' and a 'nigger' on multiple occasions.") Further, in *Chaney*, Plainfield handed out daily assignments in writing that would unambiguously disclose that certain residents preferred no black CNAs. *Id.*

Here, Plaintiff's alleged incidents of racial hostility occurred over a course of almost three years, a far cry from three months. Furthermore, the racial preferences of the patients were recorded on the intake forms, and were not distributed to the nurses daily. Dkt. No. 32 (Exhibit 3) (Pg. ID No. 735). The nurses would only see the preferences if they went into an administrative office. *Id.* Moreover, one of the Hiring Managers, Ebbonye Graham, removed the preference question from the intake form. *Id.* ("I believe at that time, Ebbonye got that NBW off of writing on the directions and reminded everyone that 'As Beaumont, we will not discriminate.' "). Therefore, the facts do not rise to the severity of *Chaney*, and the hostile work environment claim fails.

### C.  Constructive Discharge

To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). To determine if there is a constructive discharge,

both the employer's intent and the employee's objective feelings must be examined. *E.g., Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982). Intent can be shown by demonstrating that quitting was a foreseeable consequence of the employer's actions. *Moore*, 171 F.3d at 1080. The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also. *Jenkins v. Southeastern Mich. Chapter, Am. Red Cross*, 141 Mich. App. 785, 796, 369 N.W.2d 223, 229 (1985) (applying Elliott–Larsen Civil Rights Act).

Here, the Plaintiff has failed to show a Title VII violation, let alone that the Defendant deliberately created intolerable working conditions "with the intention of forcing the employee to quit." Instead of actually analyzing the issue, Plaintiff merely just concludes that "it is obvious that the treatment received by Plaintiff . . . was simply an effort to force her to resign." Dkt. No. 32 at 30 (Pg. ID No. 551). The fact that the Defendant took remedial action, such as diversity trainings and writing up offending employees, would indicate otherwise. Accordingly, the constructive discharge claim fails.

### D. Retaliation

To establish retaliation under Title VII, a plaintiff must show (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action and (3) that the adverse action occurred because of the protected activity. *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990). The Elliott–Larsen Act, M.C.L. § 37.2701(a), requires the plaintiff to demonstrate that (1) he opposed violations of the Act or participated in an activity protected by the Act and (2) his opposition or participation was a "significant factor" in the adverse employment action. The causal connection between the adverse employment action and the protected activity may be established by demonstrating that the adverse action was taken

-8-

shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

Defendants argue, again, that because Plaintiff has not shown any adverse employment action, that this claim should fail. *See* Dkt. No. 21 at 21 (Pg. ID No. 97). Defendants do not dispute that the Plaintiff engaged in a protected activity.

The Sixth Circuit has held that *de minimis* employment actions are not materially adverse and, thus, not actionable. *Ford v. General Motors Corp.*, 305 F.3d 545, 553 (6th Cir. 2002). An adverse employment action must be sufficiently "material" to satisfy the required element of retaliation. *Id.* In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2414-16 (2006), the Supreme Court recognized that the standard for retaliation *is not as high as the standard for discrimination under Title VII*. The Court held that, to prove retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.* at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Plaintiff points to the *Ford* case to argue that "heightened scrutiny could be deemed adverse employment actions." Dkt. No. 32 at 29 (Pg. ID No. 550). However, Plaintiff's argument is an oversimplification of the *Ford* case. In *Ford*, the Sixth Circuit held that "Plaintiff's increased workload, heightened scrutiny, and constructive discharge was not *de minimis* employment action. Rather, *taken together*, it constituted materially adverse employment action sufficient to satisfy the third prong of the *prima facie* test." *Ford*, 305 F.3d at 554 (emphasis added).

-9-

Plaintiff also argues that under *Meyer v. City of Center Line*, 242 Mich. App. 560, 571 (2000), that "a supervisor's failure to respond to an employee's complaints of coworker harassment can constitute an adverse employment action for the purposes of a retaliation claim." Dkt. No. 32 at 29–30 (Pg. ID No. 550–51). This is another over-simplification of the case. *Meyer* held "that a supervisor's decision not to take action to stop harassment by co-workers *in retaliation for an employee's opposition to a violation of the Civil Rights Act* can constitute an adverse employment action." *Meyer*, 242 Mich. App. at 571 (emphasis added). In other words, if it is shown that co-workers have retaliated, and the employer decides to not take action, then the burden has been met. However, Plaintiff has not demonstrated that any of her co-workers engaged in any retaliation. Thus, *Meyer* is not particularly useful.

Here, there is evidence that Plaintiff was under heightened scrutiny after engaging in protected activities. Approximately one week after reporting a racial incident with another coworker, Plaintiff received two written reprimands from Defendant Richardson. Dkt. No. 32 at 17 (Pg. ID No. 538). It was the first time Plaintiff had been disciplined in her entire 19 year career. *Id.* Eleven days later, on October 11, 2013, Plaintiff was informed by the Human Resources Department that other employees felt uncomfortable working with her, and that she would be receiving a third reprimand. Dkt. No. 32 at 18.

As stated above, it is not entirely clear what these written reprimands entail. However, Plaintiff was an at will employee of the employer. Despite the fact that written reprimands do not meet the necessary threshold for an adverse employment action as it pertains to disparate treatment claims, a reasonable juror could find that several written reprimands could dissuade a reasonable employee from filing complaints. Further, due to the proximity in time that the reprimands stood in relation to the complaints, Plaintiff has put forth enough evidence to satisfy

the causation prong of the retaliation claim. Accordingly, the Defendants' Motion as to the retaliation claim is denied.

## V. CONCLUSION

For the reasons discussed above, the Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

IT IS SO ORDERED.

Dated: December 22, 2015                    /s/Gershwin A Drain
Detroit, MI                                 HON. GERSHWIN A. DRAIN
                                            United States District Court Judge